UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| VINCENT J. BIFOLCK, AS EXECUTOR | : |
| OF THE ESTATE OF JEANETTE D. | : |
| BIFOLCK AND INDIVIDUALLY | : |
| | : |
| | : |
| | : |
| V. | : |
| | : |
| | : |
| PHILIP MORRIS, INC. | :                    NOVEMBER 3, 2006 |

## COMPLAINT

### I.    INTRODUCTION

Plaintiff Vincent J. Bifolck brings this action, individually and in his capacity as the

Executor of the Estate of his late wife, Jeanette D. Bifolck, against defendant Philip Morris, Inc.,

(i) pursuant to the Connecticut Product Liability Act, Conn. Gen. Stat. § 52-572m, et seq., to

recover monetary damages for Jeanette D. Bifolck's wrongful death caused by smoking

defendant's cigarettes, and (ii) pursuant to the Connecticut Unfair Trade Practices Act, Conn.

Gen. Stat. § 42-110a, et seq., to recover monetary damages and other relief to remedy

defendant's unfair trade practices.

### II.    JURISDICTION

1.  Jurisdiction is conferred on this Court by 28 U.S.C. § 1332(a)(l) in that the plaintiff

and the defendant are citizens of different states and the amount in controversy exceeds

$75,000.00, exclusive of interest and costs.  Venue is proper in this District pursuant to 28

U.S.C. § 1391(a).

## III.    PARTIES

2.  Plaintiff Vincent J. Bifolck is the widower of Jeanette D. Bifolck and the Executor of her Estate.  Plaintiff brings this action in his capacity as Executor of the Estate of Jeanette D. Bifolck and individually.  Plaintiff is a resident of Vernon, Connecticut.

3.  Defendant Philip Morris Incorporated ("Philip Morris") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York 10017.  At all times mentioned herein, defendant Philip Morris manufactured, distributed and marketed cigarette tobacco products, including cigarettes under the brand names of Marlboro and Marlboro Lights, for sale to the public in Connecticut and throughout the United States.

## IV.    CLAIMS FOR RELIEF

### A.  FIRST CLAIM FOR RELIEF

1.- 3.  Paragraphs 1 through 3 of this Complaint are incorporated herein as paragraphs 1 through 3 of the First Claim for Relief.

4.  Commencing in the early-1970's, and continuing for decades thereafter, plaintiff's decedent Jeanette D. Bifolck smoked cigarettes manufactured, distributed and marketed by defendant Philip Morris.  Until approximately 1997, Jeanette D. Bifolck smoked defendant's Marlboro cigarettes.  Commencing in approximately 1997, Jeanette D. Bifolck smoked defendant's Marlboro Lights cigarettes.

5.  The Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck contained cancer-causing ingredients and, when smoked, delivered such ingredients to smokers

in a form and quantity sufficient to cause smokers to develop lung cancer, other forms of cancer and other forms of disease.

6. The Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck contained nicotine and, when smoked, delivered nicotine to smokers in a form and quantity sufficient to cause smokers to become addicted to the nicotine.

7. As a result of her smoking defendant's cigarettes, Jeanette D. Bifolck became addicted to nicotine and was unable to stop smoking.

8. As a result of her smoking defendant's cigarettes, Jeanette D. Bifolck contracted non-small cell lung cancer.

9. Jeanette D. Bifolck's lung cancer was caused by the toxic ingredients in the Marlboro and Marlboro Lights cigarettes she smoked.

10. As a result of her injuries, Jeanette D. Bifolck incurred medical expenses for care and treatment, including radiation treatment and chemotherapy.

11. Jeanette D. Bifolck died on March 9, 2000, at the age of 42, as a result of the lung cancer she contracted and the medical complications thereof, including extensive metastasis and respiratory failure.

12. As a result of her injuries, Jeanette D. Bifolck was deprived of the opportunity to carry on her normal life's activities and, as a result of her death, she was permanently deprived of such opportunity.

13. As a result of her injuries, Jeanette D. Bifolck's earning capacity was impaired and, as a result of her death, her earning capacity was permanently destroyed.

14. As a result of her injuries, Jeanette D. Bifolck suffered severe emotional distress, anguish and anxiety, including fear of death.

15. As a result of her injuries, Jeanette D. Bifolck suffered severe physical pain and disability.

16. As a result of her death, the Estate of Jeanette D. Bifolck incurred funeral expenses.

17. Defendant Philip Morris is liable to the Estate of Jeanette D. Bifolck pursuant to the Connecticut Product Liability Act, Conn. Gen. Stat. § 52-572n et seq., including Conn. Gen. Stat. § 52-240b, for her injuries and death in each of the following respects:

(a) Strict Liability

18. At all times mentioned herein, defendant Philip Morris was and continues to date to be engaged in the business of manufacturing, distributing and marketing cigarette products, including the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck.

19. The Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck were defective and unreasonably dangerous to persons smoking them in that, when used as intended, they caused lung cancer (and other forms of cancer and disease) and were addictive.

20. Jeanette D. Bifolck's injuries were caused by the defective and unreasonably dangerous nature of the Marlboro and Marlboro Lights cigarettes she smoked.

21. The defective and unreasonably dangerous condition of defendant's cigarettes existed at the time they were distributed and sold by defendant Philip Morris.

22.  Defendant Philip Morris expected its cigarettes to reach their ultimate user without substantial change in condition, and they did so reach Jeanette D. Bifolck without substantial change in condition.

23.  Defendant Philip Morris is strictly liable to Jeanette D. Bifolck for her injuries and death resulting from defendant Philip Morris' manufacture and distribution of said defective and unreasonably dangerous cigarettes.

(b) Breach of Express Warranty

24.  In the course of promoting the sale of the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck, defendant Philip Morris expressly warranted that its cigarettes were safe for their normal and expected use by users, that if defendant Philip Morris discovered that such cigarettes were hazardous to health, it would so advise the consuming public, and that if any components found in its cigarettes were determined to cause or contribute to disease, it would remove such components.

25.  These warranties included repeated, express public promises by the defendant, including in the "Frank Statement" published in 1954 in over 400 newspapers with circulation of over 43 million in 258 cities in the United States (and re-published by or on behalf of defendant thereafter), and by defendant's top executives, including its Chief Executive Officer in 1954, its President in 1962, and one of its high-ranking Vice Presidents in 1972, that defendant would stop manufacturing cigarettes if it learned that the product was harmful.  As James Bowling, defendant's Vice President, publicly stated in 1972:

> If our product is harmful ... we'll stop making it. We now know enough that
> we can take anything out of our product, but we don't know what ingredients
> to take out.

26. The Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck were, in fact, not safe for their normal and expected use in that they were hazardous to health, capable of causing humans who smoked them to contract lung cancer, and addictive.

27. At the time defendant Philip Morris manufactured and distributed the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck, defendant Philip Morris knew that they contained ingredients that cause lung cancer and other forms of cancer and disease, but, contrary to its representations, it did not so advise the consuming public or remove the toxic ingredients in the cigarettes.

28. In the course of promoting the Marlboro Lights cigarettes smoked by Jeanette D. Bifolck, defendant Philip Morris expressly represented that its Marlboro Lights cigarettes provided lowered tar and nicotine than regular cigarettes.

29. The Marlboro Lights cigarettes smoked by Jeanette D. Bifolck did not, in fact, provide consumers with lowered tar and nicotine.

30. At the time defendant Philip Morris manufactured and distributed the Marlboro Lights cigarettes smoked by Jeanette D. Bifolck, defendant Philip Morris knew that its Marlboro Lights cigarettes did not provide consumers with lowered tar and nicotine.

31. At the time she began smoking Marlboro cigarettes and for a number of years thereafter, Jeanette D. Bifolck was not aware that defendant's Marlboro cigarettes were

hazardous to health, contained toxic, cancer-causing ingredients and were capable of causing lung cancer in persons who smoked them, and were addictive.

32.  At the time she switched to Marlboro Lights and for a number of years thereafter, Jeanette D. Bifolck was not aware that defendant's Marlboro Lights cigarettes did not provide lowered tar and nicotine.

33.  Defendant Philip Morris' warranties and representations were intended by defendant Philip Morris to induce consumers, including Jeanette D. Bifolck, to smoke and continue to smoke, and to purchase its cigarette products.

34.  Jeanette D. Bifolck knew of and relied on defendant Philip Morris' warranties and representations.

35.  Jeanette D. Bifolck's lung cancer and other injuries and death were caused by defendant Philip Morris' breach of its express warranties.

(c) Breach of Implied Warranty

36.  In the course of promoting the sale of the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck, defendant Philip Morris impliedly warranted its Marlboro and Marlboro Lights cigarettes to be safe and merchantable and to be fit for the ordinary purpose for which they would be used, and in particular, to be safe for their normal and intended use.

37.  The Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck were, in fact, not safe or merchantable and fit for their normal and expected use in that they were hazardous to health, capable of causing humans who smoked them to contract lung cancer, and addictive.

38. The Marlboro Lights cigarettes smoked by Jeanette D. Bifolck were, in fact, not safe or merchantable and fit for their normal and expected use in that they did not provide lowered tar and nicotine and were as likely, if not more likely, than defendant's regular cigarettes to be addictive and to cause humans who smoked them to contract lung cancer and other disease.

39. Jeanette D. Bifolck's lung cancer and other injuries were caused by defendant Philip Morris' breach of its implied warranties.

(d) Improper Manufacture and Design

40. Defendant Philip Morris designed and manufactured the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck to enhance the addictive nature of the cigarettes, though knowing that smokers such as Jeanette D. Bifolck would become addicted to Marlboro and Marlboro Lights cigarettes and would increase their use and likelihood of developing lung cancer (and other disease) as a result of such use.

41. Defendant Philip Morris designed and manufactured the Marlboro Lights cigarettes smoked by Jeanette D. Bifolck to increase the amount of tar and nicotine delivered to the smoker, knowing that smokers such as Jeanette D. Bifolck would, as a result, increase their use and likelihood of developing lung cancer (and other disease).

42. Defendant Philip Morris failed and refused to implement changes in the design of the Marlboro and Marlboro Lights cigarettes smoked by Jeanette D. Bifolck that would have reduced the addictive and harmful nature of the product.

43. Jeanette D. Bifolck's lung cancer and other injuries were caused by defendant Philip Morris' improper manufacture and design of its Marlboro and Marlboro Lights cigarettes.

8

(e) <u>Statutory Punitive Damages</u>

44.   The harm suffered by Jeanette D. Bifolck was the result of defendant Philip Morris' reckless disregard for the safety of its product users.

## B. SECOND CLAIM FOR RELIEF

1. - 44.   Paragraphs 1 - 44 of the First Claim for Relief are incorporated herein as paragraphs 1 - 44 of the Second Claim for Relief.

45.   Plaintiff Vincent J. Bifolck married Jeanette D. Bifolck in 1976 and remained married and living with her until her death in March 2000.

46.   As a result of defendant Philip Morris' wrongful conduct, plaintiff Vincent J. Bifolck has suffered emotional distress from learning of his wife's illness and injuries, and will continue to suffer distress and anxiety in the future.

47.   As a further result of defendant Philip Morris' wrongful conduct, plaintiff Vincent J. Bifolck has been deprived of the consortium and services of his wife, Jeanette D. Bifolck, and will continue to suffer such deprivation in the future.

48.   Defendant Philip Morris is liable to plaintiff Vincent J. Bifolck for his injuries as aforesaid.

## C. THIRD CLAIM FOR RELIEF

1.- 3.   Paragraphs 1 through 3 of this Complaint are incorporated herein as paragraphs 1 through 3 of the Third Claim for Relief.

4. Defendant Philip Morris is liable to the Estate of Jeanette D. Bifolck pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq., for the losses sustained by Jeanette D. Bifolck as a result of defendant Philip Morris' unfair and deceptive acts in the conduct of its trade, in each of the following respects:

(a) Defendant's "Open Question" Strategy

5. Beginning in 1954 and continuing through at least 2000, defendant Philip Morris, acting in concert with other United States and international cigarette manufacturers (and their agents), entered into a wrongful scheme and engaged in a wrongful course of conduct comprised of unfair and deceptive acts and representations in the conduct of its business [the "Open Question" strategy], to persuade the American consuming public that there was a bona fide scientific controversy concerning whether or not cigarette smoking is harmful to smokers' health, including whether or not smoking causes lung cancer, and whether or not the nicotine in cigarettes is addictive when, in fact, it knew that no such scientific controversy truly existed.

6. Defendant Philip Morris, individually and in conspiracy with the other tobacco companies and related entities, adopted this deliberately false "Open Question" position as a long-term public relations in response to growing public fears about lung cancer and other health hazards of smoking, in order to maintain a market for its products.

7. Defendant Philip Morris further adopted the "Open Question" position as a litigation strategy in order to avoid liability for injuries suffered by consumers using its products and to provide it with a false defense at trial in the event lawsuits were brought against it.

10

8. The "Open Question" strategy was expressly set forth in a 1972 memorandum from

Fred Panzer, then Vice-President of The Tobacco Institute, to Horace R. Kornegay, its then

Chairman:

> For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts – litigation, politics and public opinion.
>
> While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not – nor was it intended to be – a vehicle for victory.  On the contrary, it has always been a holding strategy, consisting of
>
> > – creating doubt about the health charge without actually denying it
> >
> > – advocating the public's right to smoke, without actually urging them to take up the practice
> >
> > – encouraging objective scientific research as the only way to resolve the question of health hazard
>
> ....
>
> As an industry, therefore, we are committed to an ill-defined middle ground which is articulated by variations on the theme that, "the case is not proved." ....
>
> In the cigarette controversy, the public – especially those who are present and potential supporters (e.g. tobacco state congressmen and heavy smokers) – must perceive, understand and believe in evidence to sustain their opinions that smoking may not be the causal factor.

9. In furtherance of said wrongful scheme, defendant Philip Morris and the other United

States cigarette manufacturers participated in creating and funding The Tobacco Institute, a

tobacco industry trade association that intentionally issued statements on behalf of defendant

Philip Morris falsely maintaining that there was a bona fide scientific controversy concerning whether or not cigarette smoking was harmful to smokers' health, including whether or not smoking causes lung cancer. (The repeated false statements by The Tobacco Institute are too numerous to list in their entirety. A detailed description of many, but not all, of the numerous false statements in this regard issued by The Tobacco Institute is set forth in the annexed Exhibit A.)

10. In furtherance of said wrongful scheme, defendant Philip Morris and the other United States tobacco manufacturers further participated in creating and funding The Tobacco Industry Research Committee ("TIRC"), later renamed the Council for Tobacco Research - USA, Inc. ("CTR"), and represented, falsely, that through the TIRC/CTR the industry would undertake independent research and a full and independent investigation of the health hazards of smoking and disclose fully the results of such research and investigation. (The repeated false statements by defendant Philip Morris and the other United States tobacco manufacturers concerning such independent research and promised disclosure are too numerous to list in their entirety. A detailed description of many, but not all, of the numerous false statements by defendant Philip Morris and the other United States tobacco manufacturers in such regards is set forth in the annexed Exhibit A.)

11. In furtherance of said wrongful scheme, defendant Philip Morris falsely represented that it (along with the other United States cigarette manufacturers) would investigate and disclose any health hazards of cigarettes, when, in fact, although it well knew of the health hazards

(including the addictive nature of its cigarettes), it did not intend to so disclose them and did not do so. (The repeated false statements by defendant Philip Morris are too numerous to list in their entirety. A detailed description of many, but not all, of the numerous false statements by defendant Philip Morris in this regard is set forth in the annexed Exhibit A.)

12. In furtherance of said wrongful scheme, defendant Philip Morris represented that if it was ever determined that any component or components found in cigarette smoke cause or contribute to be a cause of any disease in humans, then Philip Morris would remove such component(s) from its cigarette products, although it well knew of the existence of such disease-causing components and did not remove such components, nor did it intend to or attempt to remove them. (See Exhibit A for the details of one or more of defendant Philip Morris' representations to such effect.)

13. Commencing prior to 1973, and continuing thereafter until at least 2000, defendant Philip Morris has made or caused to be made, directly or indirectly, explicitly or by implication, representations which have been and are material, false and likely to mislead consumers, including, but not limited to the following:

a. That defendant Philip Morris would lead an effort to discover and disclose to the public the truth about the health effects of tobacco products use;

b. That use of tobacco products has not been proven to cause and exacerbate diseases;

13

c. That defendant Philip Morris does not believe its tobacco products to be harmful to health;

d. That nicotine contained in tobacco products is not addictive;

e. That defendant Philip Morris does not exploit or manipulate the nicotine in tobacco products.

(The repeated false statements by defendant Philip Morris are too numerous to list in their entirety. A detailed description of many, but not all, of the numerous false statements by defendant Philip Morris in these regards is set forth in the annexed Exhibit A.)

14. In furtherance of said wrongful scheme, and with the knowledge and approval of defendant Philip Morris, the other United States tobacco manufacturers issued false statements similar to the false statements by defendant Philip Morris and The Tobacco Institute described above. (The repeated false statements by the other United States tobacco manufacturers from are too numerous to list in their entirety. A detailed description of many, but not all, of the numerous false statements by the tobacco industry in these regards is set forth in the annexed Exhibit A.)

15. At all times relevant herein, contrary to the representations of defendant Philip Morris, and others acting in behalf of defendant Philip Morris and/or in furtherance of defendant Philip Morris' wrongful scheme, defendant Philip Morris has known that its representations were false and deliberately issued those misrepresentations as part of a continuing and ongoing course of conduct in order to induce the public, including Jeanette D. Bifolck, to begin and to continue

14

purchasing defendant's cigarettes, to maintain the market for its cigarettes products, to artificially inflate the price of its cigarette products and to avoid liability for injuries suffered by consumers using its products.

16. Contrary to the representations of defendant Philip Morris and its co-conspirators that there was a bona fide scientific controversy concerning the health effects of cigarette smoking (and contrary to the representations of defendant Philip Morris and its co-conspirators that they would investigate and disclose any health hazards of cigarettes), defendant Philip Morris knew from its own studies and information available to it, that the scientific evidence established irrefutably the link between tobacco use and human disease, including lung cancer.

17. Notwithstanding Philip Morris' own private acknowledgment of the established causal relationship between smoking and disease, defendant Philip Morris, individually and in conspiracy with the other tobacco companies and related entities, for over four decades falsely maintained a public position, through an ongoing nationwide public relations campaign, that there is still doubt as to whether smoking causes disease, that the health charges against smoking have not been proven and that more research is necessary before the health "controversy" can be resolved.

18. Defendant Philip Morris' continuing false misrepresentations that there is still doubt as to whether smoking causes disease, despite its knowledge that no such doubt existed, were likely to mislead a reasonable consumer and had the effect of misleading consumers, including Jeanette D. Bifolck. Defendant's misrepresentations as aforesaid were undertaken to induce and had the effect of inducing the public, including Jeanette D. Bifolck, to begin and to continue

purchasing defendant's cigarettes, to maintain the market for its cigarettes products, to artificially inflate the price of its cigarette products and to fraudulently conceal the existence of a cause of action for consumers injured by the use of its products and by Philip Morris' unfair trade practices.

19.  Contrary to the repeated representations made by defendant Philip Morris and by other entities acting on its behalf, defendant Philip Morris has known of the addictive properties of the nicotine contained in the tobacco products it manufactures and sell.

20.  Contrary to its representations that it does not exploit or manipulate the nicotine in its tobacco products, defendant Philip Morris has, in fact, deliberately controlled and manipulated the level of nicotine in its products.

21.  Contrary to defendant Philip Morris' representations, and as defendant Philip Morris was fully aware, the nicotine contained in defendant Philip Morris' tobacco products, including its Marlboro and Marlboro Lights cigarettes, is addictive.

22.  Contrary to defendant Philip Morris' representations, defendant Philip Morris relied upon the addictive nature of nicotine in designing, marketing and selling tobacco products, including its Marlboro and Marlboro Lights cigarettes in order to enhance sales.

23.  This public deception and the secret manipulation of nicotine were and are critically important to defendant Philip Morris and its co-conspirators.  As objective researchers increased their warnings about the health dangers of tobacco products, nicotine addiction kept people consumers those products despite those warnings.  This aspect of the deception practiced by defendant Philip Morris and its co-conspirators allowed and continues to allow Philip Morris to

continue to sell its dangerous products – even to those who eventually come to doubt the industry's health claims. And if a new consumer was fooled for a time by "pro-tobacco" disinformation on health or seduced by Philip Morris' aggressive marketing techniques, and uses tobacco products, it may well be too late. Instead of a simple decision not to purchase a product, the consumer then must fight an addiction to nicotine.

24. Defendant Philip Morris, individually and in conspiracy with the other tobacco companies and related entities, also recognized that it must misrepresent the addictive quality of nicotine not only to maintain the acceptability of its products and thus maximize the number of smokers who would become addicted, but also to avoid liability for the injuries caused to addicted smokers.

25. As a 1980 internal Tobacco Institute document reveals:

> Shook, Hardy [& Bacon, longtime tobacco defense lawyers] reminds us, I'm told, that the entire matter of addiction is the most potent weapon a prosecuting attorney can have in a lung cancer/cigarette case. We can't defend continued smoking as "free choice" if the person was "addicted."

26. Defendant Philip Morris' false denials of the addictive nature of the nicotine in its products and its false denials that it does not manipulate the level of nicotine in its products, were likely to mislead a reasonable consumer and had the effect of misleading consumers, including Jeanette D. Bifolck. Defendant's misrepresentations as aforesaid were undertaken to induce and had the effect of inducing the public, including Jeanette D. Bifolck, to begin and to continue purchasing defendant's cigarettes, to maintain the market for its cigarettes products, to artificially inflate the price of its cigarette products and to fraudulently conceal the existence of a cause of

action for consumers injured by the use of its products and by Philip Morris' unfair trade practices.

27.  At all times relevant herein, defendant Philip Morris was aware that it was critical to the success of its "Open Question" strategy (including its strategy of denying the addictiveness of nicotine in its products) that all of the tobacco companies act together to misrepresent the true nature of the research concerning the health risks of tobacco, the addictiveness of nicotine, and the tobacco companies' manipulation of the nicotine in their products.  This was so, because the conspiracy would only succeed if all of the conspirators maintained the truth of the misrepresentations being made; if any one conspirator revealed the true nature of the research concerning the health risks of tobacco, the addictiveness of nicotine and the companies' manipulation of the nicotine in their products, the misrepresentations asserted by the other companies would be exposed.

28.  Defendant Philip Morris entered into this conspiracy in order to preserve consumer purchases of its products in the face of consumer fears of lung cancer and other disease and to avoid producing any evidence that could be used to establish its liability for injuries and medical expenses incurred by consumers of its products.

29.  In furtherance of its conspiracy and contrary to its representations to the consuming public, defendant Philip Morris has participated in a wrongful agreement with other United States tobacco manufacturers limiting, on an industry-wide basis, in-house biological research concerning the health effects of smoking and, at the specific behest of one or more of its co-conspirators has intentionally and wrongfully disbanded existing research efforts.

18

30. Thus, prior to 1970, one of defendant's co-conspirators, R.J. Reynolds Tobacco Company ["Reynolds"], had established a facility, nicknamed the "Mouse House," in Winston-Salem, North Carolina to perform research on mice concerning the health effects of smoking. Reynolds' scientists conducted research at that facility in a number of specific areas, including studies of the actual mechanism whereby smoking causes emphysema in the lungs. Internal Reynolds' documents established that the Mouse House work had been "the more important of the smoking and health research effort because it comes close to determining what was thought to be the underlying pathobiology of emphysema."

31. In 1969, scientists at defendant Philip Morris had developed plans for in-house biological research at that company. When those plans were presented to Philip Morris' Chairman, however, he declined to pursue such in-house biological work because of the illegal industry agreement not to conduct any in-house research studying the relationship between smoking and disease. When the Chairman of Philip Morris was subsequently advised that Reynolds *was* conducting such research, he telephoned the President of Reynolds and complained that Reynolds was violating the industry agreement.

32. On March 19, 1970, upon receipt of the complaint from the Chairman of Philip Morris, and despite the ongoing research work at the Mouse House, the President of Reynolds disbanded the entire research division in one day and fired all 26 scientists without notice.

(b) Defendant's Fraud concerning "Light" Cigarettes

33. Since 1971, defendant has manufactured and distributed Marlboro Lights cigarettes, and has represented that such cigarettes provide "lowered tar and nicotine."

34. Since 1971, defendant has knowingly marketed Marlboro Lights cigarettes as having "lowered tar and nicotine" in order to appeal to smokers concerned about possible health hazards of smoking.

35. Defendant's representations that its Marlboro Lights cigarettes have "lowered tar and nicotine" have been knowingly false.

36. Contrary to its representations that its Marlboro Lights cigarettes have "lowered tar and nicotine," defendant has designed Marlboro Lights cigarettes to deliver higher levels of tar and nicotine in actual human cigarette smoking conditions than defendant has represented.

37. Defendant has further deliberately designed its Marlboro Lights cigarettes to enhance the amount of tar and nicotine that smokers receive.

38. Defendant has, further, deliberately concealed that the smoke produced by Marlboro Lights is more genotoxic (causing genetic and chromosomal damage) per milligram of tar than "regular" cigarettes.

39. Defendant's representations that its Marlboro Lights cigarettes have "lowered tar and nicotine" were knowingly false and fraudulent and were intended to mislead the public, including Jeanette D. Bifolck, into believing that said Marlboro Lights cigarettes were safer than "regular" cigarettes.

40. Defendant's misrepresentations that its Marlboro Lights cigarettes have "lowered tar and nicotine" had the effect of misleading consumers, including Jeanette D. Bifolck, into believing that Marlboro Lights cigarettes were safer than "regular" cigarettes and into purchasing Marlboro Lights cigarettes in reliance thereon.

### (c) Defendant's Youth Targeting Activities

41.  In the early 1970's, and for a number of years prior thereto and thereafter, including throughout the period that Jeanette D. Bifolck was a minor under the age of 16, defendant Philip Morris adopted a deliberate marketing strategy for its cigarette products pursuant to which defendant intentionally marketed addictive cigarette products, including Marlboro cigarettes, in a manner that targeted children and adolescents for the purpose of intentionally attracting minors to begin to smoke, addict them, and thereby induce them to continue to smoke defendant's addictive cigarettes and thus create for itself a long-term base of consumers.

42.  Defendant Philip Morris' marketing efforts directed at minors influenced, and were intended to influence, the perception of minors that it is safe to smoke by appealing to short-term benefits while discounting long-term effects.

43.  Defendant Philip Morris targeted and marketed to minors with the intention and effect of causing smoking among minors to become more socially acceptable and thereby to increase the market for its cigarette products among minors who will grow to become adult smokers.

44.  The conduct of defendant Philip Morris in intentionally marketing its addictive cigarette products in a manner that targeted children and adolescents and intentionally attracted them to begin to smoke and to addict them and thereby cause them to continue to smoke and purchase defendant's cigarettes was immoral, unscrupulous and in violation of the public policy of the State of Connecticut.

45.  As a result of defendant Philip Morris' wrongful conduct as herein described, Jeanette D. Bifolck began purchasing and smoking defendant's Marlboro cigarettes while still a minor under the age of 16 and became a long-term addicted smoker.

46.  Defendant Philip Morris, individually, and through statements by the Tobacco Institute issued on its behalf, has for over 40 years falsely denied that it has engaged in illegal targeting of sales of its products to minors. Defendant Philip Morris has falsely represented, and approved of false representations by The Tobacco Institute issued on behalf of defendant Philip Morris, that defendant Philip Morris has not targeted, directed or sought to focus its cigarette products marketing efforts on minors and, in fact, actively discouraged sale of its cigarette product to minors from the 1950's on.  Such false representations have been made by defendant Philip Morris on numerous occasions over the years and to date.  Beginning in 1964, and continuing to date, defendant Philip Morris has publicly represented that it abides by an "industry code" prohibiting advertising and promotion directed at young people.  On repeated occasions since 1964, Philip Morris has approved and joined in publications, press statements and interviews by The Tobacco Institute representing that the industry had not and did not seek to market cigarettes to minors, including such Tobacco Institute publications as "In the Public Interest  Three Decades of Initiatives by a Responsible Cigarette Industry" distributed by The Tobacco Institute in the late 1980's that stated

> "For the past thirty years -- and for the future -- this industry has maintained responsible positions in four policy areas of concern to all Americans, smokers and nonsmokers alike:  YOUTH SMOKING ...
>
> ON YOUTH SMOKING

Cigarette manufacturers have always believed that the decision to smoke or not is a choice to be made by informed adults,"

and thereafter detailed purported actions by the tobacco industry, including defendant Philip Morris, to prevent smoking by minors;  a 1982 nationwide advertising campaign by The Tobacco Institute that included statements, *inter alia*, such as

"Do cigarette companies want kids to smoke?  No.  As a matter of policy.  No. As a matter of practice.  No.  As a matter of fact.  No"

and

"We think that's good [a purported decrease in teen smoking] because we don't think kids should smoke;"

Tobacco Institute publications and advertisements in the 1980's reaffirming the industry's purported commitment to the prohibition in the industry code against marketing to minors and the industry's long-standing position against marketing to minors [e.g., "In The Public Interest Three Decades of Initiatives by a Responsible Cigarette Industry"], "Tobacco:  Helping Youth Say No," "Helping Youth Decide"], and in the 1990's ["It's Tough Growing Up"], containing such statements as "The tobacco industry believes that smoking should be a part of growing up."

47.  Contrary to its public representations that it has not targeted minors or marketed its tobacco products to minors, defendant Philip Morris was for at least five decades actively engaged in targeting sales of its products to minors and in conspiring with the other tobacco companies and through The Tobacco Institute, to conceal its illegal efforts to sell its products to minors.

48. Contrary to its public representations, defendant Philip Morris carefully studied the smoking trends of minors and investigated why they smoke and how best to appeal to them and collected and analyzed information on the smoking habits of children as young as 12.

49. Defendant Philip Morris' continued fraudulent misrepresentations about its illegal targeting of sales of its products to minors were made to fraudulently conceal the existence of a cause of action from consumers who began smoking as minors and were injured by its illegal marketing practices, including Philip Morris, and had the effect of so concealing such a cause of action from injured consumers, including Philip Morris.

50. By its conduct as aforesaid, defendant Philip Morris fraudulently concealed from Philip Morris and other consumers who began smoking as minors their cause of action against defendant Philip Morris for its illegal scheme of marketing to minors.

51. Jeannette D. Bifolck sustained financial loss and other harm as a result of defendant's youth targeting and marketing activities, as well as a result of defendant's fraudulent statements and concealment of its illegal targeting of sales of its products to minors.

52. Defendant Philip Morris' deliberate misrepresentations about the health hazards of tobacco products use, including its false assertions that there is a bona fide scientific controversy about whether tobacco use cases disease, were further intended to affect the decisions of consumers to buy tobacco products and thereby to affect the price of those products. As a result of defendants' deliberate misrepresentations as aforesaid, defendant Philip Morris unfairly and deceptively maintained the price of its tobacco products, including its Marlboro and Marlboro Lights cigarettes, at an inflated level not otherwise obtainable and caused Jeanette D. Bifolck and

the consuming public generally to pay more for the cigarettes that they purchased than was warranted or than they would otherwise have paid in the absence of these misrepresentations.

53. Defendant Philip Morris' deliberate misrepresentations about the addictive nature of nicotine and about its deliberate undertakings to control and manipulate the level of nicotine in its tobacco products, including its Marlboro and Marlboro Lights Salem cigarettes, were further intended to affect the decisions of consumers to buy tobacco products and thereby to affect the price of those products. As a result of defendants' deliberate misrepresentations as aforesaid, defendant Philip Morris unfairly and deceptively maintained the price of its tobacco products, including its Marlboro and Marlboro Lights cigarettes, at an inflated level not otherwise obtainable and caused Jeanette D. Bifolck and the consuming public generally to pay more for the cigarettes that they purchased than was warranted or than they would otherwise have paid in the absence of these misrepresentations.

54. Defendant Philip Morris' deceptive representations and actions as aforesaid were material, false and were likely to cause consumers, including Jeanette D. Bifolck, to begin and/or continue to smoke and to mislead consumers, including Jeanette D. Bifolck, about the adverse health consequences of tobacco products use and the addictive nature of nicotine.

55. Defendant Philip Morris has reaped millions of dollars in sales of its Marlboro and Marlboro Lights and other tobacco products in Connecticut to Jeanette D. Bifolck and other consumers as a result of its deceptive representations and actions as aforesaid, and its deceptive representations and actions as aforesaid were intended to enable it to reap such wrongful gains.

56. Defendant Philip Morris has been able to avoid payment of millions of dollars to consumers injured by virtue of their use of its cigarette products as a result of its deceptive representations and actions as aforesaid, and its deceptive representations and actions as aforesaid were intended to enable it to reap such wrongful gains and to conceal the true state of facts applicable to causes of action by injured consumers, including Jeanette D. Bifolck.

57. Jeanette D. Bifolck was injured as a result of defendant Philip Morris' wrongful scheme in that she was induced to begin smoking cigarettes as a minor, to continue purchasing defendant Philip Morris' cigarettes, to become addicted to cigarettes and to continue smoking as an addicted smoker by virtue of defendant Philip Morris' illegal youth targeting, misrepresentations about the health hazards and addictive nature of its cigarettes, manipulation of the nicotine in its cigarettes and other conduct set forth in this Claim for Relief.

58. Jeanette D. Bifolck was further injured as a result of defendant Philip Morris' wrongful scheme in that she was caused to pay more for the cigarettes she purchased than was warranted by virtue of defendant Philip Morris' illegal youth targeting, misrepresentations about the health hazards and addictive nature of its cigarettes, and manipulation of the nicotine in its cigarettes, and other conduct set forth in this Claim for Relief.

59. Defendant Philip Morris' deceptive representations and actions as aforesaid as alleged herein constitute deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

60. Defendant Philip Morris' course of wrongful conduct as aforesaid, which began prior to 1973 and continued at least until the time of Jeanette D. Bifolck's death in 2000, violated the public policy of the State of Connecticut.

26

61. Defendant Philip Morris' acts and practices, as alleged herein, were unethical, oppressive and unscrupulous, and caused substantial injury to consumers, including Jeanette D. Bifolck.

62. Defendant Philip Morris' acts and practices, as alleged herein, constituted unfair acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

63. At all times mentioned herein, defendant Philip Morris was acting in the conduct of its business, which involved the manufacture and distribution for sale of cigarette tobacco products.

64. Defendant Philip Morris acted, as alleged herein, in the conduct of trade or commerce as defined in Conn. Gen. Stat. § 42-110a(4).

65. The conduct of defendant Philip Morris (and its agents and co-wrongdoers) as aforesaid was unfair or deceptive in the conduct of a business, in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq.

66. As a consequence of defendant Philip Morris' wrongful conduct as aforesaid, Jeanette D. Bifolck suffered financial loss.

## V.    **PRAYER FOR RELIEF**

Wherefore, plaintiff prays the following relief:

1. Compensatory damages;

2. Punitive damages pursuant to Conn. Gen. Stats. § 52-240b;

3. Punitive damages pursuant to Conn. Gen. Stats. § 42a-110g(a);

4. Attorneys' fees and costs pursuant to Conn. Gen. Stats. § 42a-110g(d);

2. Punitive damages pursuant to Conn. Gen. Stats. § 52-240b;

3. Punitive damages pursuant to Conn. Gen. Stats. § 42a-110g(a);

4. Attorneys' fees and costs pursuant to Conn. Gen. Stats. § 42a-110g(d);

5. Such other relief, including equitable orders of disgorgement and/or restitution, as the

Court deems appropriate.

Dated at Stamford, Connecticut this 3rd day of November, 2006.

PLAINTIFF VINCENT J. BIFOLCK, AS
EXECUTOR OF THE ESTATE OF JEANETTE D.
BIFOLCK AND INDIVIDUALLY

BY_____

DAVID S. GOLUB  ct 00145
JONATHAN M. LEVINE   ct 07584
MARILYN J. RAMOS  ct 114433
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CT  06904
(203) 325-4491

28

TO THE CLERK

PLEASE ENTER THE FOLLOWING APPEARANCES FOR
PLAINTIFF VINCENT J. BIFOLCK, AS EXECUTOR
OF THE ESTATE OF JEANETTE D. BIFOLCK
AND INDIVIDUALLY:


DAVID S. GOLUB ct 00145
JONATHAN M. LEVINE ct 07584
MARILYN J. RAMOS  ct 114433
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT 06904.